IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
July 11, 2012 Session

# TERRY GUPTON, ET AL. v. GARY A. DAVIS d/b/a GARY A. DAVIS & ASSOCIATES, ET AL.

**Appeal from the Chancery Court for Roane County**
**No. 16719      Frank V. Williams, III, Chancellor**

---

**No. E2011-02215-COA-R3-CV-FILED-SEPTEMBER 25, 2012**

---

This appeal arises from what essentially is a fee dispute between lawyers. A Tennessee Valley Authority ("TVA") coal ash spill in 2008 damaged the farm of Sandra and Terry Gupton ("the Guptons"). The Guptons signed contingent fee agreements with Gary A. Davis ("Davis"), Stephen Crofford ("Crofford"), and Mary Parker ("Parker") ("the Defendants," collectively) to pursue their case. Rebecca Vernetti ("Vernetti"), a lawyer in Davis's firm who worked on the Guptons' case, left Davis's law firm to start her own law firm. The Guptons fired Davis and hired Vernetti. The Guptons later reached an agreement with TVA to sell their farm to TVA, and Vernetti received her fee. The Guptons sued the Defendants in the Chancery Court for Roane County ("the Trial Court"), seeking judgment to the effect that they need not pay any fees to the Defendants. The Defendants counterclaimed and also sued Vernetti, arguing that they should be paid as per their original agreement with the Guptons. The Trial Court declined to award the Defendants their original contingency fee, but instead granted a judgment to the Defendants against Vernetti and her law firm on a *quantum meruit* theory for their legal services to the Guptons. Vernetti appeals, and the Defendants raise additional issues. We affirm the judgment of the Trial Court in its entirety.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., and JOHN W. MCCLARTY, JJ., joined.

Rebecca C. Vernetti, Sevierville, Tennessee, for the appellant, Vernetti Law Group, P.C., and, pro se appellant.

Gary A. Davis, Stephen Crofford, and Mary Parker, pro se appellees.

# OPINION

## Background

This case originated in the aftermath of a TVA coal ash spill in December 2008. The Guptons owned a farm that was heavily damaged by the spill. The Guptons originally retained Davis to represent them.[1] Davis went on to represent a host of people affected by the ash spill in an attempted class action suit in Federal District Court. Vernetti, an associate at Davis's firm, was Davis's point person to the Guptons on the ash spill matter. Vernetti left Davis's firm, and the Guptons fired Davis and hired Vernetti.[2] The Defendants asserted an alleged attorney's lien in order to recover what he regarded as due compensation for legal work performed for the Guptons before they fired him. The Defendants filed notice of an attorney's lien in Federal District Court. The Guptons, represented by Vernetti, eventually reached a settlement with TVA wherein the Guptons sold TVA their farm for $3,600,000. Fundamentally, this appeal is about a dispute over fees between Vernetti, who represented the Guptons at their settlement, and the Defendants, who, before being terminated, performed legal work on the Guptons' claim.

In June 2010, the Guptons[3], represented by Vernetti, filed a complaint in the Trial Court for declaratory judgment and injunction against the Defendants. The Guptons sought not to have to pay the Defendants any money for the Defendants' work on the Guptons' case prior to the Guptons switching attorneys, or, in the alternative, to limit money owed to the hours the Defendants could prove they worked specifically for the Guptons. The Guptons alleged that they never intended to hire Parker and Crofford. The Guptons also filed a motion for temporary injunction, requesting that the Trial Court enjoin the Defendants from pursuing acts in furtherance of their attorney's lien.

For their part, the Defendants filed a motion for temporary restraining order, requesting that the Guptons be prevented from disbursing one third of the settlement funds received from any of their claims. The Defendants also filed an answer and counterclaim to

---

[1]The Guptons also originally signed retainer agreements with Parker and Crofford. The Guptons, however, have asserted throughout the case that they did not intend for Parker and Crofford to be their attorneys.

[2]We are aware that Vernetti's law firm also is a party on appeal. However, for convenience, we may at times refer simply to Vernetti where appropriate.

[3]A number of other individuals involved in the ash spill litigation were co-plaintiffs, but, this case was tried on the Guptons' claims only, and this appeal concerns only the Guptons. The Guptons are parties on appeal but did not submit any briefs.

the Guptons' complaint, raising numerous causes of action, and sued Vernetti as well in a third party complaint. The Trial Court granted the Defendant's motion for temporary restraining order. Additionally, in a separate order, the Trial Court ordered Vernetti to provide the Defendants with a detailed accounting of the settlement of the Guptons' claims against TVA and the disbursement of the settlement proceeds. Vernetti filed a motion to dismiss, which was denied. This case was tried over the course of two days in July 2011.

Sandra Gupton ("Mrs. Gupton") testified. Mrs. Gupton, a registered nurse, lived in Crossville as of the trial, having moved there after they sold their farm in Harriman, Tennessee to TVA. Mrs. Gupton stated that on December 22, 2008, a dike burst and her farm was devastated by a coal ash spill. Mrs. Gupton testified that her purpose in this suit was to "see if the Court will decide . . . if we owe any money" to the Defendants. Mrs. Gupton stated that she and her husband fired Davis because "we lost all confidence in his ability to represent us." Specifically, Mrs. Gupton testified that "[he] was unable to get ahold of. He did not get with us when he filed complaints . . . ."

Mrs. Gupton testified that she spoke with Vernetti at a January 3, 2009 meeting of people affected by the ash spill. Mrs. Gupton signed a retainer agreement with Parker and Crofford, but Mrs. Gupton testified that she did not intend for them to represent her. Rather, Mrs. Gupton believed she was being represented by Davis through Vernetti. Later, in March 2009, the Guptons signed a retainer agreement with Davis. Mrs. Gupton testified that she did not remember either Parker or Crofford communicating with the Guptons or keeping them informed on their case. Mrs. Gupton testified that Vernetti was her primary point of contact in the representation. Continuing with her testimony, Mrs. Gupton stated that she did not want to be part of a class action suit, and that she had expressed this. Mrs. Gupton testified that she never had been involved in litigation before, and was "nervous" and "upset." Mrs. Gupton stated that she only discovered weeks after the fact that a class action suit had been filed on behalf of the Guptons and others. Settlement negotiations eventually terminated, and TVA filed a motion to dismiss. Mrs. Gupton stated that she found out about TVA's action by watching the news, and through Vernetti, but that Davis never discussed the matter with her.

Mrs. Gupton testified about a meeting in February 2010, with representatives from Beasley Allen, a firm that Davis associated on the case. It was Mrs. Gupton's impression as a result of this meeting that she and her husband had been "dropped." Mrs. Gupton also testified that a representative from Beasley Allen made insulting remarks to her about the Gupton farm and their farming practices, and Davis said nothing to defend her. Mrs. Gupton said she was "greatly offended." At the end of February 2010, the Guptons fired Davis by mail. According to Mrs. Gupton, she spoke to Vernetti, who informed Mrs. Gupton that she was leaving Davis's firm. Mrs. Gupton testified that she then asked Vernetti

to represent her and her husband going forward. Mrs. Gupton stated that, at the time of the change in representation, Davis used vulgarity in a phone conversation the two had. Regarding the Guptons' faith in Davis, Mrs. Gupton stated: "We lost faith in his ability, lost all credibility [sic] in him, lost all confidence in his ability."

When pressed as to whether she knew that a class action suit was pending in her case, Mrs. Gupton testified: "It was never explained - - no - - [Davis] didn't come down and sit down at our home, sit down and talk to us. We didn't review this. No one came to our home and sat down and explained it to us. No one. You didn't. Mary Parker didn't. Gary Davis didn't. No one sat down and explained what a class action was." Mrs. Gupton acknowledged that she had nothing in writing from the period of representation by Davis showing that she was dissatisfied.

Mrs. Gupton stated that she and her Husband, then represented by Vernetti, settled with TVA in May 2010 and received payment in June 2010. The settlement involved the sale to TVA of the Guptons' farm for $3,600,000, of which Vernetti's fee was $900,000. Mrs. Gupton testified that she spoke to Davis about three or four times over the course of the representation, which was from January 2009 through February 2010. When asked why she felt Vernetti had done a good job if she had not successfully conveyed the Guptons' wishes to Davis, Mrs. Gupton testified: "She's his junior. What can she say to him?" Mrs. Gupton further clarified her views on Davis, stating: "I wish I'd never met the man." Mrs. Gupton also acknowledged referring to Davis as "pond scum."

Terry Gupton ("Mr. Gupton") testified. Mr. Gupton stated that he had been a farmer for 50 years. Mr. Gupton testified that he retained Davis to represent him and his wife in the TVA ash spill matter. Mr. Gupton acknowledged signing a retainer agreement with Parker and Crofford but stated that he did not intend for them to be his attorneys. Mr. Gupton explained why he terminated Davis:

> Well, in my own words, I was dissatisfied with the happenings that happened early in 2010. And from the meetings that my wife had testified to, I had decided personally, probably even before she did, that we needed to do something else because Mr. Davis didn't have our interests at heart, and I didn't have any confidence that he could continue our case and get any end result that we would be satisfied with.

Mr. Gupton also testified that he thought he had a good medical case to be pursued, but that Davis did not pursue it despite Mr. Gupton anticipating that he would. Additionally, Mr. Gupton testified that he informed Davis that he did not want to be in a class action suit, though he could not remember precisely when he expressed this view.

The Trial Court also heard the testimony of Davis. Davis, a practicing attorney, testified that he had 28 years experience in the field of environmental law. Davis had been an environmental engineer before becoming an attorney. With respect to the role of Parker and Crofford in this case, Davis stated that his agreement with them was to split their fees 50/50 between the firms. Davis stated at no time did the Guptons complain about their representation.

Davis testified that he did not believe his firm had been fired for cause. With respect to communication with the Guptons, Davis testified:

> In listening to the Guptons, I probably should have paid more attention to them personally, rather than delegating that to my associate. But she did a very good job of handling the clients on a day-to-day basis, so I thought we were providing enough attention to the Guptons. Obviously, they don't think so.

Davis testified that he took every call the Guptons made to him when he was in his office. Though Davis was chagrined at Vernetti's actions in leaving his firm in the manner in which she did, Davis firmly denied ever cursing or using vulgarity with Mrs. Gupton.

Davis stated that there were around 150 plaintiffs in the action against TVA. Davis testified that he spent at least 1,230 hours on the TVA case, and that the TVA case utterly consumed his attention for a period of time. Davis also testified that he covered about $15,000 in expenses on the Guptons. Davis requested that, if he did not recover his 1/3 contract fee with the Guptons, he should receive a fee under a *quantum meruit* theory.

Nita Gorman ("Gorman"), a paralegal in Davis's law office, testified. Gorman testified that when the Guptons called the office and asked for Davis, he talked to them if he was present. Gorman stated that she had four messages from the Guptons, and that she was "sure" the calls were returned. Gorman testified that the Guptons never complained to her.

Vernetti testified. Vernetti stated that she worked for Davis from July 2007 until February 2010. Vernetti served as the contact person for Davis's firm with the Guptons. Vernetti testified that her office initially made a settlement demand of $10,000,000 to TVA, which TVA rejected. TVA responded with its own offer. Eventually, the settlement negotiations ended, and TVA filed its motion to dismiss. Throughout this period and beyond, Vernetti remained the Davis firm's chief contact to the Guptons.

Vernetti testified that the Guptons did not want to be part of a class action suit. Vernetti stated that in February 2010, Mrs. Gupton asked Vernetti to represent the Guptons

going forward. Vernetti undertook to represent the Guptons, at a reduced contingent fee of 25%, which Vernetti said was not unusual at her new firm, the Vernetti Law Group, P.C. Vernetti testified regarding how the case eventually was settled:

> Q:      And could you explain to the Court how your office ultimately came to the settlement number and the - - any discussions you had about resolving that case.
>
> A:      Sure. We learned in late April 2010 that - - and it was a grapevine rumor, but we learned that TVA was interested in clay and topsoil on the Guptons' property. Because of the proximity of their property to the ash spill and TVA's need to cap their ash pond and also their, then, resulting need for additional landfill space, it was a logical conclusion they may be willing to buy the Guptons' land at that point because they needed clay and topsoil and they - - once they dug all the clay and topsoil out, they'd have additional landfill area.
>
> Q:      Did you have the opportunity, then, to ultimately price out the value of the clay and topsoil?
>
> A:      Yes. I made phone calls to various businesses around the area to find out what the going rate for a yard of clay and a yard of topsoil were; sat down and figured out the numbers. We took a hard look at what - - you know, TVA was moving into Phase III of their clean-up, and so we were trying to figure out if - - you know, exactly how to approach it, but - - but ultimately we put down numbers based on what we thought the clay and the topsoil were worth. TVA countered, and eventually we came to a number.

In June 2010, the Guptons signed the settlement documents. The settlement saw the Guptons sell their farm to TVA for $3,600,000, of which Vernetti received $900,000 as her 25% contingency fee. Vernetti testified that five percent of the settlement funds were withheld by TVA, but eventually Vernetti recouped this as part of her fee. This withheld portion of the settlement became a point of contention because the Trial Court previously had instructed Vernetti to account for imminent disbursements of the settlement monies, and Vernetti did not disclose that TVA was holding this five percent to be paid out later by TVA.

In September 2011, the Trial Court entered its final order, incorporating a memorandum opinion that stated:

Much time and effort had been expended by Counter-plaintiffs on behalf of a large number of people claiming property damage and other losses as a result of the TVA coal ash spill on December 22, 2008, but it is difficult to see, given the terms finally negotiated between TVA and the Guptons, how any significant service by the Counter-plaintiffs contributed to that settled after the Guptons terminated their relationship with Gary Davis. The only significant service provided by Davis, Parker, Crofford, and other lawyers to the Guptons was the effort to defeat TVA's Motion to Dismiss. There was scant evidence of the time actually spent by Davis on the brief in opposition to TVA's Motion to Dismiss, and, such as it was, must be attributed to the other clients of Mr. Davis as well as the Guptons. Much of the work framing the opposition to TVA's motion apparently came from other law firms representing other litigants. The name of Mr. Davis did not even appear on the brief.

It was not until the Guptons had fired Davis and hired Vernetti that the U.S. District Court denied a significant portion of TVA's Motion to Dismiss. During the time while a ruling on the Motion was pending, TVA apparently took no action to settle any of the claims by hundreds of litigants. After the Courts denied part of TVA's Motion, representatives of TVA approached the Guptons, then represented by Vernetti, with a settlement offer that involved few, if any, of the typical elements of damages recoverable in such cases. Rather, TVA needed to buy the Guptons' farm to excavate the clay and topsoil as a means of burying the coal ash. For this, TVA agreed to pay the Guptons a premium for their land. While Vernetti negotiated the settlement on those terms, it was reasonable to conclude based upon circumstantial evidence that the District Court's denial of the Motion to Dismiss may, and probably did, result in a larger recovery for the Guptons.

Given the fact that Davis and the other Counter-plaintiffs were also working for numerous other clients, and that Davis was terminated for cause, the benefit actually conferred on the Guptons should be considered in the context of the potential overall benefit conferred on numerous other litigants. Accordingly, the Court finds that the Counter-plaintiffs should have and recover of Rebecca Vernetti a total of One hundred fifty thousand ninety-six and 26/100 dollars ($150,096.26) including the $15,096.26 in expenses incurred specifically for the Guptons.

The Court will not enter a Judgment against the Guptons. They are caught, as Mr. Crofford observed, in a dispute between lawyers over a fee, and

have paid a reasonable fee to Rebecca Vernetti who should now compensate her former employer, Gary Davis, for work performed by him on the Plaintiffs' brief while she was still employed by him.

Additionally, Counter-plaintiffs should transcribe all relevant sections of the record of Court proceedings in which Rebecca Vernetti falsely represented to the Court that all of the fees collected by her from the TVA settlement with the Guptons had been disbursed. Copies of those portions of the transcript shall be forward to the Board of Professional Responsibility for whatever action the Board deems appropriate.

In September 2011, the Defendants filed a motion for discretionary costs. In October 2011, the Trial Court granted the Defendants' motion and awarded them $8,925.65 in discretionary costs. The Trial Court stated:

As to the specific objections of the Defendant's this Court specifically ordered in the Final Order of Judgment that Counter-Plaintiffs Davis, Parker and Crofford transcribe all relevant sections of the record of the court proceedings in which Rebecca Vernetti falsely represented to the Court that all of the fees collected by her from the TVA settlement with the Guptons had been disbursed. Vernetti's Counsel objected to the inclusion of the pre-trial transcript costs as part of the discretionary costs. Additionally, he objected to the transcript costs except for the portion of the testimony given by Attorney Vernetti being included as discretionary costs. The Court specifically finds that the pre-trial hearings were necessary to be transcribed and included as discretionary costs to comply with the Court's previous Order, as was the entirety of the trial transcript, due to the testimony of various witnesses throughout the trial being necessary to comply with the Court's Order.

Vernetti's Counsel also objected to the deposition costs of non-suited Plaintiffs/witnesses being included as discretionary costs. The Court finds that these witnesses were parties at the time the depositions were taken. They were non-suited shortly before trial and they were potential witnesses at trial, and therefore, should be included as discretionary costs.

The Trial Court entered an order in January 2012 which, among other things, clarified that it had, in fact, intended to enter judgment against both Rebecca Vernetti individually and the Vernetti Law Group, P.C. Vernetti filed this appeal.

**Discussion**

We restate Vernetti's issues on appeal as follows: 1) whether the Trial Court erred in denying Vernetti's motion to dismiss; 2) whether the Trial Court erred in awarding a judgment against Vernetti and her law firm in favor of the Defendants; and, 3) whether the Trial Court erred in awarding discretionary costs to the Defendants.[4] The Defendants raise issues of their own, but we regard them as subsumed into our discussion and resolution of Vernetti's issues.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

This appeal concerns, among other issues, the Trial Court's disposal of Vernetti's motion to dismiss. Our Supreme Court has discussed the standard for addressing motions to dismiss:

The standards by which our courts should assess and dispose of a Rule 12.02(6) motion to dismiss are well-established and have been clearly and consistently applied in Tennessee for nearly forty years, following the adoption of the Tennessee Rules of Civil Procedure in 1970.

A Rule 12.02(6) motion challenges only the legal sufficiency of the complaint, not the strength of the plaintiff's proof or evidence. *Highwoods Props., Inc. v. City of Memphis*, 297 S.W.3d 695, 700 (Tenn. 2009); *Willis v. Tenn. Dep't of Corr.*, 113 S.W.3d 706, 710 (Tenn. 2003); *Bell ex rel. Snyder v. Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A.*, 986 S.W.2d 550, 554 (Tenn. 1999); *Sanders v. Vinson*, 558 S.W.2d 838, 840 (Tenn. 1977). The resolution of a 12.02(6) motion to dismiss is determined by an examination of the pleadings alone. *Leggett v. Duke Energy Corp.*, 308 S.W.3d 843, 851 (Tenn. 2010); *Trau–Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 696 (Tenn. 2002); *Cook ex rel. Uithoven v. Spinnaker's of Rivergate, Inc.*, 878

---

[4]Though not stated exactly as such, Vernetti also asks us to consider the issue of whether the Trial Court erred in its finding that Vernetti made false representations to the Trial Court pertaining to the disbursement of the settlement funds. We do not consider this issue germaine to the disposition of this appeal, and, therefore, we will not address it.

S.W.2d 934, 938 (Tenn. 1994); *Cornpropst v. Sloan*, 528 S.W.2d 188, 190 (Tenn. 1975) (*overruled on other grounds by McClung v. Delta Square Ltd. P'ship*, 937 S.W.2d 891, 899–900 (Tenn. 1996)). A defendant who files a motion to dismiss " 'admits the truth of all of the relevant and material allegations contained in the complaint, but ... asserts that the allegations fail to establish a cause of action.' " *Brown v. Tenn. Title Loans, Inc.*, 328 S.W.3d 850, 854 (Tenn. 2010) (quoting *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 516 (Tenn. 2005)); *see Edwards v. Allen*, 216 S.W.3d 278, 284 (Tenn. 2007); *White v. Revco Disc. Drug Ctrs., Inc.*, 33 S.W.3d 713, 718 (Tenn. 2000); *Holloway v. Putnam Cnty.*, 534 S.W.2d 292, 296 (Tenn. 1976).

In considering a motion to dismiss, courts " 'must construe the complaint liberally, presuming all factual allegations to be true and giving the plaintiff the benefit of all reasonable inferences.' " *Tigg v. Pirelli Tire Corp.*, 232 S.W.3d 28, 31–32 (Tenn. 2007) (quoting *Trau–Med*, 71 S.W.3d at 696); *see Leach v. Taylor*, 124 S.W.3d 87, 92–93 (Tenn. 2004); *Stein v. Davidson Hotel Co.*, 945 S.W.2d 714, 716 (Tenn. 1997); *Bellar v. Baptist Hosp., Inc.*, 559 S.W.2d 788, 790 (Tenn. 1978); *see also City of Brentwood v. Metro. Bd. of Zoning Appeals,* 149 S.W.3d 49, 54 (Tenn. Ct. App. 2004) (holding that courts "must construe the complaint liberally in favor of the plaintiff by ... giving the plaintiff the benefit of all the inferences that can be reasonably drawn from the pleaded facts"). A trial court should grant a motion to dismiss "only when it appears that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief." *Crews v. Buckman Labs. Int'l, Inc.*, 78 S.W.3d 852, 857 (Tenn. 2002); *see Lanier v. Rains*, 229 S.W.3d 656, 660 (Tenn. 2007); *Doe v. Sundquist*, 2 S.W.3d 919, 922 (Tenn. 1999); *Pemberton v. Am. Distilled Spirits Co.*, 664 S.W.2d 690, 691 (Tenn. 1984); *Fuerst v. Methodist Hosp. S.*, 566 S.W.2d 847, 848 (Tenn. 1978); *Ladd v. Roane Hosiery, Inc.*, 556 S.W.2d 758, 759–60 (Tenn. 1977). We review the trial court's legal conclusions regarding the adequacy of the complaint de novo. *Brown*, 328 S.W.3d at 855; *Stein*, 945 S.W.2d at 716.

*Webb v. Nashville Area Habitat for Humanity, Inc.*, 346 S.W.3d 422, 426 (Tenn. 2011).

Vernetti argues that the Defendants' third party complaint against her failed to comply with Rules 14.01[5] and Rule 12.02(6) of the Tennessee Rules of Civil Procedure

---

[5]The rule provides in pertinent part: "At any time after commencement of the action a defending party, as a third-party plaintiff, may cause a summons and complaint to be served upon a person not a party

(continued...)

for multiple reasons: 1) failure to demonstrate that Vernetti was or might be liable for all or part of the plaintiffs' claim against the Defendants; 2) Vernetti and Vernetti Law Group, P.C. should not have been joined to the lawsuit because the Defendants' claims allegedly arose out of a separate set of facts; and, 3) failure to state a claim upon which relief can be granted.

We disagree with Vernetti. Vernetti, and her law firm, received a $900,000 fee from the Guptons. The attorneys' compensation is, as we have already noted, at the heart of this case, and failure to join all these parties would have been judicially inefficient at best. The Trial Court did not err by, in effect, consolidating these related claims. Furthermore, the Defendants' third party complaint did state claims for which relief could be granted, including recovery on a theory of *quantum meruit* under which this case ultimately was disposed. We find this issue to be without merit.

We next address whether the Trial Court erred in awarding a judgment against Vernetti and her law firm in favor of the Defendants. In Tennessee, a client has the right to discharge his or her attorney with or without cause. *Chambliss, Bahner & Crawford v. Luther*, 531 S.W.2d 108, 109 (Tenn. Ct. App. 1975). Whether or not the client had just cause to discharge his or her attorney directly impacts the potential compensation the discharged attorney may be entitled to receive for services performed. In *Adams v. Mellen*, 618 S.W.2d 485 (Tenn. Ct. App. 1981), this Court discussed the type of damages available to an attorney discharged without cause. Quoting *Brownlow v. Payne*, 2 Tenn.App. 154, 162 (1925), the *Adams* Court stated:

> Where an attorney has been discharged by his client without cause, the attorney may rescind the contract of employment and may recover on a quantum meruit for services rendered up to the date of his discharge; or he may treat the contract as continuing, although broken by the client, and may recover for the breach. According to the weight of authority, the measure of damages for such breach of contract, is the full contract price.

*Adams*, 618 S.W.2d at 488. An attorney discharged without cause can thus elect to recover based on the full contract price or on *quantum meruit*, whichever is greater.

As one might expect, the relief available to an attorney who is discharged for cause is not as favorable. When an attorney is discharged for cause, the attorney is entitled to recover on the basis of *quantum meruit* or breach of contract, *whichever is less. See*

---

[5](...continued)
to the action who is or may be liable to the third-party plaintiff for all or part of the plaintiff's claim against the third-party plaintiff. . . ." Tenn. R. Civ. P. 14.01.

*Crawford v. Logan*, 656 S.W.2d 360, 364 (Tenn. 1983).[6] A "for cause" firing "includes the client's right to discharge the attorney whenever the client ceases to have absolute confidence in the relationship. *See Chambliss, Bahner, and Crawford v. Luther*, 531 S.W.2d 108 (Tenn.App.1975)." *McGee v. Maynard*, No. 01–A–01–9810–CV–00539, 1999 WL 824298 at *2, 1999 Tenn.App. LEXIS 559 at *4 (Tenn. Ct. App. Aug. 12, 1999), *no appl. perm. appeal filed*. However, we have stated:

> [I]n order for a client . . . to establish that he terminated his attorney's . . . services for cause because he lost confidence in his attorney, the client must prove that he actually did lose confidence in his attorney and that his reasons for the loss of confidence leading to the attorney's discharge were objectively reasonable.

*Rose v. Welch*, 115 S.W.3d 478, 487 (Tenn. Ct. App. 2003).

Here, we believe the evidence does not preponderate against the Trial Court's finding that the Guptons fired Davis for cause. The Guptons, in their testimony, articulated objectively reasonable reasons for their loss of confidence in Davis. For example, the Guptons did not want to be part of a class action suit. The Guptons believed Davis was not attentive to them in terms of adequate communication. The Trial Court clearly found the Guptons to be credible. We find nothing in the record to cause us to question the Trial Court's credibility determination as to the Guptons. In his brief, Davis argues for a higher standard for "cause," but we disagree. We find that the Guptons' loss of confidence in Davis, rooted in an objectively reasonable basis, was sufficient for the purpose of our analysis to establish cause for their termination of Davis as their attorney.

We agree with the Trial Court that Davis's termination was for cause, and, we further agree with the Trial Court that Davis should receive a measure of compensation for the legal work he performed for the Guptons. At the very least, the defeat of TVA's motion to dismiss, an effort in which Davis played a role, very likely aided the Guptons' legal cause.[7] As Davis was fired for cause, and, recovery under breach of contract would be greater than under *quantum meruit*, we now examine application of *quantum meruit*. Both parties on

---

[6]The *Crawford* Court went on to hold that misconduct of an attorney in violation of a statute or acts against public policy, or in breach of the attorney's fiduciary duty to the client may support a complete forfeiture of fees, depending on the particular facts and circumstances of the case. *Crawford*, 656 S.W.2d at 364, 365.

[7]Vernetti objects to Parker and Crofford also being included in the judgment. We find that the Trial Court did not err in including Parker and Crofford in its judgment.

appeal take issue with the Trial Court's utilization of *quantum meruit*, though naturally, to different ends. Nevertheless, we believe the Trial Court was right to proceed under this theory.

We have discussed *quantum meruit*:

Recovery under a theory of quantum meruit is "based on a legally implied promise to pay a reasonable amount for goods or services received," and is therefore limited to the actual value of the goods or services received. *Castelli v. Lien*, 910 S.W.2d 420, 427 (Tenn. Ct. App. 1995) (citing *John J. Heirigs Constr. Co. v. EXIDE*, 709 S.W.2d 604, 607 (Tenn. Ct. App. 1986); *Tennessee Farmers Mut. Ins. Co. v. Pritchett*, 54 Tenn.App. 410, 417, 391 S.W.2d 671, 675 (1964)). In order to recover under a theory of quantum meruit, existence of the following circumstances must be proven:

(1) there must be no existing, enforceable contract between the parties covering the same subject matter;

(2) the party seeking recovery must prove that it provided valuable goods and services;

(3) the party to be charged must have received the goods and services;

(4) the circumstances must indicate that the parties involved in the transaction should have reasonably understood that the person providing the goods or services expected to be compensated;

(5) the circumstances must also demonstrate that it would be unjust for the party benefitting from the goods or services to retain them without paying for them.

910 S.W.2d at 427 (internal citations omitted).

\*\*\*

Recovery under quantum meruit is not measured by the detriment to the plaintiff but by the benefit conferred on the defendant. *McGee v. Maynard*, No. 01–A–01–9810–CV–00539, 1999 WL 824298, at \*2 (Tenn. Ct. App.

-13-

Aug. 12, 1999) (citing *Castelli v. Lien*, 910 S.W.2d 420 (Tenn. Ct. App. 1995)). DR 2–106 lists the factors on which a reasonable fee can be based:

> (1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.
>
> (2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.
>
> (3) The fee customarily charged in the locality for similar legal services.
>
> (4) The amount involved and the results obtained.
>
> (5) The time limitations imposed by the client or by the circumstances.
>
> (6) The nature and length of the professional relationship with the client.
>
> (7) The experience, reputation, and ability of the lawyer or lawyers performing the services.
>
> (8) Whether the fee is fixed or contingent.

> *Johnson v. Hunter*, 1999 WL 1072562 (Tenn. Ct. App. 1999) (citing Sup.Ct. Rule, Code of Prof. Resp. DR 2–106; *see also Connors v. Connors*, 594 S.W.2d 672, 676–77 (Tenn. 1980) (citing DR 2–106)).

*Mitch Grissim & Assoc. v. Bluecross & Blueshield of Tennessee*, 114 S.W.3d 531, 537-38 (Tenn. Ct. App. 2002).[8]

The Defendants also argue that their judgment should be against the Guptons rather than Vernetti and the Vernetti Law Group, P.C. Given the evidence contained in the record, we agree with the Trial Court that this basically is a fee dispute between the

---

[8]We note that the Rules of Professional Conduct have been updated and revised since *Grissim*. Nevertheless, the core of the factors in determining a reasonable fee remains the same.

Defendants and Vernetti. As such, we believe the Trial Court appropriately decided that the Defendants' fee should be recovered from Vernetti and Vernetti Law Group, P.C. as the Guptons already had paid $900,000 in attorney fees to Vernetti and her law firm. We find no error in the Trial Court's decision to award the Defendants their judgment against both Vernetti and her law firm, Vernetti Law Group, P.C., and not against the Guptons who already have paid $900,000 in attorney fees for what in essence was nothing more than the sale of their farm to TVA.

While the precise amount of $135,000 in non-specifically incurred fees is disputed by the parties, we cannot say the Trial Court erred in setting it as such. While the record contains evidence of Davis's time spent on the TVA ash spill litigation, it is difficult to ascertain with certainty just what time was spent on the Guptons' behalf and from which they benefitted. We are cognizant that *quantum meruit* is based on benefit conferred, rather than direct compensation for hours spent in service. Therefore, we believe it essentially was inevitable that the Trial Court's final figure would be subject to reasonable dispute. However, this lack of precision is not a basis for overturning the Trial Court's award, and the evidence does not preponderate against the Trial Court's findings relevant to the amount awarded. We affirm the judgment of the Trial Court as to this issue as we find no reversible error in the Trial Court's award to the Defendants.[9]

We next address whether the Trial Court erred in awarding discretionary costs to the Defendants. Tenn. R. Civ. P. 54.04 (2) states:

> (2) Costs not included in the bill of costs prepared by the clerk are allowable only in the court's discretion. Discretionary costs allowable are: reasonable and necessary court reporter expenses for depositions or trials, reasonable and necessary expert witness fees for depositions (or stipulated reports) and for trials, reasonable and necessary interpreter fees for depositions or trials, and guardian ad litem fees; travel expenses are not allowable discretionary costs. Subject to Rule 41.04, a party requesting discretionary costs shall file and serve a motion within thirty (30) days after entry of judgment. The trial court retains jurisdiction over a motion for discretionary costs even though a party has filed a notice of appeal. The court may tax discretionary costs at the time of voluntary dismissal. In the event an appeal results in the final disposition of the case, under which there is a different prevailing party than the prevailing party under the trial court's judgment, the new prevailing party may request

---

[9]Vernetti also asserts that the Trial Court made a "mistake" in holding her law group liable in addition to her. However, the Trial Court specifically reaffirmed its intention to hold Vernetti Law Group, P.C. liable in a later order, and we find no error by the Trial Court in doing so.

discretionary costs by filing a motion in the trial court, which motion shall be filed and served within thirty (30) days after filing of the appellate court's mandate in the trial court pursuant to Rule 43(a), Tenn. R. App. P.

Tenn. R. Civ. P. 54.04 (2).

We observe, as did the Trial Court in its order on discretionary costs, that some of these costs were incurred in order to comply with the Trial Court's previous order. After a careful review of the relevant law, the Tennessee Rules of Civil Procedure, and the Trial Court's order on this issue, we conclude that the Trial Court committed no reversible error in awarding the Defendants discretionary costs as it did. We affirm the Trial Court as to this issue.

We note that the Defendants moved to supplement the record with a Memorandum Opinion and Order from the Federal District Court showing that the liability issue in the TVA ash spill litigation only recently was decided in favor of the plaintiffs, and that now each individual plaintiff in that litigation is required to prove specific damages. The Defendants state that the inclusion of this order demonstrates that the Guptons were not prejudiced by their inclusion in the litigation filed by the Defendants in Federal Court as individual damages only now are being addressed in the Federal Court action some two years after the Guptons settled with TVA and received their money. In other words, if the Guptons had remained clients of the Defendants and a part of the Defendants' litigation in Federal Court, their claim still would be pending as opposed to their having received their settlement money from TVA two years ago. If this Memorandum Opinion and Order shows anything relevant to the issues before us, it seems to be that the Guptons benefitted from not continuing as one of the Defendants' many clients in the Federal Court litigation. We grant the Defendants' motion to supplement the record, but the supplemental material does not alter our Opinion in any way.

### Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed one-half against the Appellants, Rebecca C. Vernetti and Vernetti Law Group, P.C., and their surety, if any; and, one-half against the Appellees, Gary A. Davis, Stephen Crofford, and Mary Parker.

_____
D. MICHAEL SWINEY, JUDGE

-16-